McGREGOR, ALLOWAY & Co. *v.* BARKER & DIFFENDERFFER.—PLANTERS' BANK OF TENNESSEE, Intervenors—FELLOWES & Co. and YEATMAN & Co., Attaching Creditors, Defendants in Rule.

12  289<br>f125  314

An appeal will not be dismissed on the ground that the judgment was not signed when the order of appeal was made, if it appears to have been signed at the time the appeal was made out.

It is not necessary there should be as many copies of a record of appeal made out and filed as there may happen to be appellants with interests in any way conflicting. When the necessary parties are before the court, a transcript filed by any one of them, will authorize the court to adjudicate upon the merits of the whole cause.

The right of priority of a creditor making the first attachment, will not be defeated in consequence of another creditor having discovered that there was a dormant partner interested in the property attached, and having attached his interest.

When property is attached within the jurisdiction of our State courts, questions of privilege and priority among the attaching creditors, must be determined by the laws of Louisiana.

A bill was drawn in Tennessee on a merchant in London, under an authorization to draw against shipments of tobacco to an agent of the London merchant at New Orleans. On the faith of such an authorization, the intervenors discounted the bill, which the drawer afterwards refused either to accept or pay. *Held:* That the intervenors acquired no privilege upon the tobacco, which they attached in New Orleans, in the hands of the agent of the drawee, because they had no actual possession or control of the tobacco by themselves or by their agents.

Under such circumstances, in order to give the bill-holder such an interest in the tobacco as would defeat attaching creditors of the consignors, there should have been an agreement between the consignors and the consignee, that the tobacco should be held by the consignee for the benefit of the bill-holder, so that the latter would look to the fund for payment, and not to the consignee's personal credit.

APPEAL from the Sixth District Court of New Orleans, *Cotton,* J. *L. E. Simond,* for plaintiffs and appellants. *Mott & Fraser* and *Hunt & Denegre,* for *Fellowes & Co.* and *Yeatman & Co.,* appellants. *C. B. Singleton,* for the intervenor, appellee.

The opinion of the court on the motion to dismiss the appeal was delivered by

MERRICK, C. J. A motion has been made in this case to dismiss the appeal. The grounds stated in the motion are:

1st. The order allowing the appeal was granted and citation of appeal served before the judgment appealed from was signed.

2d. The appeal bond filed purports to be given in a different cause.

3d. The condition of the bond is insufficient for a suspensive appeal.

We shall only notice the first point, the others being unsupported by the facts. The judgment was rendered on the 30th day of June, 1856, and the order of appeal was granted by the Judge and the appeal bond filed on the tenth of July, the judgment not having been signed until the 12th day of July, two days after the order allowing of the appeal.

It is contended that the appeal was prematurely taken and ought to be dismissed.

We have carefully examined the cases of *Wright* v. *McNair,* 7 L. R. 513; *Cooley* v. *Seymour,* 9 L. R. 275; *Tissot* v. *Bowles,* 18 L. R. 30; *Whittemore* v. *Watts,* 4 R. R. 47; *Mechanics' Bank* v. *Walton,* 7 R. 451, and 9 An. 42. These all appear to be cases in which the judgment appealed from had not been signed at the time the transcript of appeal was made out. The older cases were decided before the Act of 1839, curing certain defects, and the Act of 1843, allowing an appeal by motion in open court, were passed.

37

McGREGOR
*v.*
BARKER.

The question now presented is, whether, where an appeal is taken at the same term at which the judgment is signed, but before the judgment is actually perfected by the signature of the judge, it is such a fault on the part of the appellant as to occasion the dismissal of the appeal.

The 19th section of the Act of the Legislature approved March 20th, 1839, provides that thereafter " no appeal to the Supreme Court shall be dismissed on account of *any defect, error or irregularity in the petition or order of appeal,* or in the certificate of the Clerk or Judge, or in the citation of appeal, or service thereof, or because the appeal was not made returnable at the next term of the Supreme Court, whenever it shall not appear that such defect, error or irregularity is imputed to the appellant; but in all such cases, the court shall grant a reasonable time to correct such errors or irregularities, (in case they are not waived by the appellee,) and may impose on the appellant such terms and conditions as in their discretion they may deem necessary for the attainment of justice, and may also impose such fines on the officer who shall have caused such irregularities, as they may deem proportioned to the offence."

Now, the judgment is pronounced in court publicly and usually in the presence of the parties. But the judgment is not often signed in their presence, but usually in the Clerk's office, or in the court room, at the pleasure of the Judge and when he has leisure at the close of the term, for that purpose.

By the 20th section of the Act just referred to, it is made the duty of the Judge in the country parishes to sign all final judgments before the adjournment of the court, whether the three judicial days have or have not elapsed since they were rendered.    Acts 1839, p. 164.

Under this statute, in some of the parishes, the custom has been to make the signing of the judgments the last thing to be done by the Judge before adjourning for the term, and in such cases, under the Act of 1843, p. 40, the motion to appeal has usually been made immediately after the motion for the new trial has been overruled, without waiting until the Judge has affixed his signature to the judgment, which would then be too late.    It would be difficult to say that the suitor is in fault for waiting the pleasure of the Judge to sign in such case.

So too in the city courts, the signing of the judgment is more particularly within the knowledge of the Judge than the counsel, and we do not think the error in the present case is to be imputed to the appellant.    It is true that he might have assured himself that the judgment was signed, by an inspection of the record upon the first opportunity ; but as three judicial days had elapsed, and the term was closed at which the judgment was rendered, he had a right to suppose that the Judge had done his duty and affixed his signature to the judgment, and that the Judge would not order the appeal without so doing.

The record containing the judgment properly signed is before us, and we see no reason to dismiss the appeal in this case on the objection made.

The motion to dismiss is, therefore, overruled.

On the merits:

SPOFFORD, J.    The defendants, *Barker & Diffenderffer*, were merchants engaged in the tobacco trade in the State of Tennessee.   Contemplating a shipment of tobacco to England, and wishing to raise funds by means thereof, they procured the following authority from the agent of a London and Liverpool house :

"CADIZ, Tenn., 28th April, 1854.

" *Messrs. Barker & Diffenderffer, Clarksville, Tenn.*

"DEAR SIRS: I hereby authorize you to draw on my father, *Mr. John K. Gilliot*, of London and Liverpool, the sum of £21, say twenty-one pounds sterling on all good and fine strips forwarded to *Mr. Walter G. Robinson*, New Orleans, to be consigned to my father in Liverpool, and £16, say sixteen pounds sterling on all seconds or lugs; the draft to be made on receipt of *Mr. Robinson's* acknowledgment of the arrival of the tobacco in New Orleans.

(Signed) "JOHN S. GILLIOT."

Shipments were made to *W. G. Robinson*, of New Orleans, as agent of *Gilliot*, by *Barker & Diffenderffer*, and on being informed by *Robinson* that he had received the tobacco, the Planters' Bank of Clarksville discounted, at successive dates, four several bills of exchange drawn by the shippers on *J. K. Gilliot*, of London, pursuant to the foregoing authorization, which was exhibited to the bank. But no assignment of the bills of lading was made to the bank.

One hundred and twenty-four hogsheads of this tobacco were attached in the hands of *W. G. Robinson*, in New Orleans, by the plaintiffs *McGregor, Alloway & Co.*, on the 30th of June, 1854, under a claim of theirs against *Barker & Diffenderffer*, who, it would seem, had become insolvent. Afterwards, the same property was attached by *Fellowes & Co.* and then by *R. Yeatman & Co.*, defendants in the rule, from the judgment whereon these appeals were taken.

*J. K. Gilliot* accepted and paid two of the four bills discounted by the Planters' Bank of Clarksville, as above described. Having heard of the attachment in New Orleans, he refused to accept or pay the other two bills, and they were protested both for non-acceptance and non-payment; it does not appear that notice of protest was given to the drawers *Barker & Diffenderffer*.

The tobacco having been attached by three creditors of the shippers in different suits, *McGregor, Alloway & Co.*, whose attachment was first in date, took a rule on *Fellowes & Co.* and *R. Yeatman & Co.*, to show cause why the proceeds of the tobacco should not be paid to them by preference.

The Planters' Bank of Clarksville afterwards intervened and claimed, by way of third opposition, the first privilege upon the tobacco or its proceeds, as holders of the two protested bills of exchange which they had discounted on the faith of the shipment and of the letter of credit or authority to draw given by *Gilliot's* agent to *Barker & Diffenderffer*, said bills amounting to the sum of $5098 62.

There was judgment awarding this sum to the bank by privilege and preference, and ordering the balance of the proceeds of the tobacco to be paid first to *McGregor, Alloway & Co.*, and then (if any should remain) to *Fellowes & Co.*

*McGregor, Alloway & Co.* have appealed from the judgment in favor of the bank, and *Fellowes & Co.* and *Yeatman & Co.* have appealed both from that judgment and the judgment in favor of *McGregor, Alloway & Co.*

The first controversy is between all the attaching creditors and the Planters' Bank of Clarksville, Tennessee. The property having been attached within the jurisdiction of our State courts, the question of privilege and priority must be determined by the laws of Louisiana. The Tennessee bank has no other lien upon the movable property attached than a citizen of Louisiana would have had, who had discounted bills drawn in this State under precisely similar circumstances. See *Lee* v. *His Creditors*, 2 An. 599. The bills under which

McGregor
v.
Barker.

the bank claims a privilege upon the tobacco attached, are of the following tenor:

"Clarksville, Tenn., June 22d, 1854.

"Sixty days after sight of this first of exchange (second and third, &c., unpaid,) pay to the order of ourselves, in London, three hundred and seventy-eight pounds sterling, value received, *and place the same to account, as advised by your friends.*

"(Signed)                    BARKER & DIFFENDERFFER.

"To *J. K. Gilliot,* Liverpool."

[Endorsed by the drawers.]

"Clarksville, Tenn., June 24th, 1854.

"Sixty days after sight of this first of exchange, (second and third, &c., unpaid,) pay to the order of ourselves, in London, five hundred and sixty-seven pounds sterling, value received, *and place the same to account of shipment of strips, as advised by your friends.*

"(Signed)                    BARKER & DIFFENDERFFER.

"To *J. K. Gilliot, Esq.,* Liverpool."

[Endorsed by drawers.]

The question is not whether *Gilliot* acquired a privilege upon the tobacco to the amount of his actual acceptances, upon its reaching the hands of his agent, *Robinson,* in New Orleans. That he did so, is conceded by all parties. For, by consent of the attaching creditors (before the intervention of the bank), the 124 hogsheads of tobacco were forwarded to *Gilliot* for sale, and he has retained without opposition, out of the proceeds, the amount of the two bills of *Barker & Diffenderffer* on himself, which he actually accepted and paid, and has remitted the balance (deducting also charges) to *W. G. Robinson,* without making any claim for the other two bills which he refused to pay, and which went to protest and are now in the hands of the bank, the intervenor in this cause. Indeed *Gilliot* claims no interest in the fund now in court which, therefore, belongs to *Barker & Diffenderffer,* subject to such privileges as are established by law.

We think that, under the law as understood and administered in the courts of Louisiana, the bank acquired no privilege upon this tobacco, because it has never had any actual or constructive possession thereof by itself or by its agents. See *Goodhue* v. *McClarty,* 3 An. 56. And it seems doubtful whether, under the extremely liberal views entertained by courts of equity with regard to the law of lien, the bank in this case could succeed in defeating the attaching creditors. See the case of *The Marine and Fire Insurance Bank of the State of Georgia* v. *Jamcey and others,* 3 Sandford's Sup. Court Rep. 257.

As already observed, the bank acquired no control whatever of the tobacco. It took no transfer of the bills of lading and was a stranger to them. These protested drafts do not on their face purport to assign the tobacco to the bank. One of them, indeed, makes no allusion to the shipment. It is plain that the authority from *Gilliot* to *Barker & Diffenderffer* to draw upon him, after the receipt of certain shipments by *Robinson,* was what the bank in the first instance looked to; in other words, to the credit of the drawee, and to the anticipation that he would accept the bills in strict pursuance of the engagement of his son and agent towards the drawers. He has broken that engagement; whether he had a legal excuse for doing so, is a question not relevant here, for *Gilliot* is no party to these proceedings. But because he has so broken

the engagement entered into on his behalf, it does not follow that a privilege rises into being, in favor of the bank over merchandise which it never had, even constructively under its control and to which it laid no claim until long after the merchandise had been attached by creditors of those to whom it confessedly belong. The mere belief of the President of the bank that the bank had a lien, cannot affect the case unless he had legal grounds for the belief. And no such grounds are disclosed in the record.

There is no subrogation to a privilege inferrible from the evidence.

The case also differs from those where a consignee has received a consignment with special instructions from the consignor to pay out of the proceeds a particular creditor of his, and the consignee has notified such creditor of the fact. Under such circumstances, it has been held that a contract springs up between the consignee and the named creditor of the consignor, which a subsequent attachment by other creditors of the consignor will not defeat. *Cutters* v. *Baker*, 2 An. 572 ; *Williams* v. *Pierce & Co.*, 10 An. 277 ; *Armor* v. *Cockburn*, 4 N. S. 667.

But here there was no contract between *Barker & Diffenderffer*, consignors, and *J. K. Gilliot*, consignee, that any particular creditor of the former should be paid by the latter out of the proceeds of this tobacco. The contract was personal between the consignors and the consignees. The bank was in no sense privy to it. There was even no stipulation *pour autrui*, so that the case differs widely from that of *Oliver* v. *Lake*, 3 An. 78. *Gilliot* agreed to accept drafts to a certain limit so soon as his agent should receive certain tobacco. He knew he would become personally bound as soon as the drafts were accepted although the tobacco should perish, or never reach Liverpool. It was his acceptance, or the belief that he would accept, *payable at all events*, that induced the bank to buy the bills. In order to give *the bill-holder* such an interest in the tobacco as would defeat attaching creditors of the consignors, there should at least have been an agreement between the consignors and the consignees, that the tobacco should be held by the consignee for the benefit of the bill-holder, so that the latter would look to the fund for payment, and not to the consignee's personal credit.

Here the President of the bank declares that he looked to *Gilliot* for payment on the strength of the letter of authority, that he still holds him liable, and that he had no confidence in the solvency of the drawers, but all confidence in the drawees.

We conclude that the judgment awarding the Planters' Bank of Clarksville, Tenn., a privilege upon the fund under attachment, must be reversed.

There is quite a different controversy between *McGregor, Alloway & Co.*, the first attaching creditors, and *Fellowes & Co.* and *R. Yeatman & Co.*, whose attachments were subsequent.

*McGregor, Alloway & Co.* appealed only from the judgment in favor of the Bank of Clarksville.

*Fellowes & Co.* and *R. Yeatman & Co.*, as already stated, appealed both from the judgment in favor of the bank and the judgment giving *McGregor, Alloway & Co.* priority over themselves. All these appeals were made returnable on the first Monday of November last. *McGregor, Alloway & Co.* procured from this court an extension of time to bring up the record, but on the same day one of the other appellants, it would seem, filed the present transcript. As *McGregor, Alloway & Co.* have never filed a transcript of the record, the other

appellants contend that they must be considered as having abandoned their appeal against the Planters' Bank of Clarksville, and that they will not, therefore, be entitled to benefit from a reversal of their judgment in favor of the bank.

We think such a rule of practice would be too rigorous and that it is not warranted by the precedents.

The record in this case is very voluminous; but one transcript was necessary, and we see no reason for adopting a construction of the law which would require as many copies of a record to be made out and filed, as there may happen to be appellants with interests in any way conflicting.

So far as the bank is concerned, *McGregor,* *Alloway & Co.* are appellants, and by the filing of this transcript we consider their appeal before us; as all the necessary parties are represented here, we can adjudicate upon the merits of the whole cause as fully as the District Court might have done.

The first attachments by these three sets of creditors were levied in suits against the commercial firm of *Barker & Diffenderffer,* the plaintiffs, *McGregor,* *Alloway & Co.,* alleging that the full names of the partners were unknown to them.

Some time afterwards *Yeatman & Co.* and *Fellowes & Co.* filed supplemental petitions, alleging that *L. G. Williams* was indebted to them *in solido* with *Barker & Diffenderffer,* and attached his interest in the tobacco or its proceeds.

These parties now contend that the interest of *Williams* is one-third of the entire shipment, and that they, as creditors of the partnership of *Barker & Diffenderffer* and *Williams,* are entitled to a payment out of the property belonging to that firm over *McGregor, Alloway & Co.,* who are creditors only of *Barker & Diffenderffer.* The accounts first sued upon by *Yeatman & Co.* and *Fellowes & Co.* make no allusion to *Williams.*

The evidence shows that *Williams* was insolvent, but that he became a dormant partner with *Barker & Diffenderffer* in the tobacco transactions out of which the claims of all the attaching creditors have sprung; that *Williams* furnished no means to the partnership, but agreed to superintend the stemmery, which he never did; that all the money was raised by *Barker & Diffenderffer* by bills on *McGregor, Alloway & Co.* and others, and that the shipments were all made in the names of *Barker & Diffenderffer,* who raised the funds. Under these circumstances *McGregor, Allaway & Co.* are as much entitled to be paid out of the property attached as those who discovered that *Williams* was a silent partner in the firm of *Barker & Diffenderffer* in their tobacco business, and attached his interest.

Finally the junior attaching creditors complain that *McGregor, Alloway & Co.* do not allow sufficient credits on their original judgment against *Barker & Diffenderffer,* for payment received through certain shipments made to them from Tennessee since the suit was instituted, and that their judgment should be still further reduced. Their judgment (4th May, 1855,) was for $20,905 91 and interest. They are willing to credit it with the sum of $9,346 78, paid July 2d, 1855, under the following circumstances:

"On the 27th June, 1854, *Barker & Diffenderffer* made an assignment of all their tobacco, in the stemmery at Cadiz, and at some other places in Tennessee, amounting to 160 hogsheads, (none of which was attached in these suits,) to *McGregor, Alloway & Co.* ond to one *Wesley Gunn,* to secure the sum of about thirty thousand dollars due the former on account of advances, and about

$6,330 57, due the latter for services in purchasing, stemming and putting up tobacco, besides the sum of about $4,260, advanced by him to farmers from whom tobacco had been purchased for *Barker & Diffenderffer.* This assignment was made in Tennessee, and is not shown to have been in contravention of her laws. *McGregor, Alloway & Co.* and *Gunn* accepted the assignment there, it being stipulated that if there was not enough to secure them both, *Gunn* should have the first lien. *Gunn* had at least a constructive possession of the tobacco, it having been shipped to *McGregor, Alloway & Co.,* in New Orleans, to be sold to pay, first, the amount stipulated as due himself, and the balance to be applied to the discharge of *McGregor, Alloway & Co.'s* claim on *Barker & Diffenderffer.*

*McGregor, Alloway & Co.* received the shipment, and faithfully carried out the contract, paying over to *Gunn* the sum of $10,590 57, and after deducting costs and charges, they consent to credit the balance of the proceeds of this tobacco ($9,346 78) on their judgment of the 4th May, 1855, against *Barker & Diffenderffer,* thus reducing it to the sum of about $11,559 13 besides interest

The other attaching creditors contend that the sums paid over to *Gunn* by *McGregor, Alloway & Co.* should also be credited on the judgment of the latter, as having been paid to *Gunn* wrongfully and in fraud of their rights.

Under the evidence we find that *McGregor, Alloway & Co.* would have been guilty of a breach of faith if they had failed to pay the stipulated sum over to *Gunn.* It is proved that the sum was justly due him by *Barker & Diffenderffer,* pursuant to a contract made at an unsuspicious time, and that *McGregor, Alloway & Co.* were only able to procure this tobacco, which has so largely reduced their original claim against *Barker & Diffenderffer,* by pledging themselves, first, to pay *Gunn.* *Gunn* had a constructive possession of the tobacco, and could have enforced his contract against *McGregor, Alloway &* [Co.] were his agents, for the purpose of paying his claim out of the proceeds of this shipment.

We see no ground for suspecting any fraud on the part of *McGregor, Alloway & Co.* in entering into and carrying out this agreement.

As to the charges for interest, &c., in their original account against *Barker & Diffenderffer,* we are of opinion that, under the pleadings and evidence, *R. Yeatman & Co.* and *Fellowes & Co.* are not in a position to question them.

It is, therefore, ordered, that the judgment appealed from be reversed; it is further ordered, adjudged and decreed, that the intervention and third opposition of the Planters' Bank of Clarksville, Tennessee, be dismissed, and that *McGregor, Alloway & Co.* be recognized as having the right to be paid by preference and priority out of the property or funds attached in the hands of *W. G. Robinson,* garnishee, the sum of $11,559 13, besides interest, or such balance as is due on their judgment against *Barker & Diffenderffer,* and costs; and if, after satisfying this judgment, there be any balance, that the right of *Fellowes & Co.* to be paid next in order be recognized, and lastly the right of *R. Yeatman & Co;* and it is further ordered, that the costs of this appeal be paid one-half by the Planters' Bank of Clarksville, Tennessee, and the other half by the appellants, *Fellowes & Co.* and *R. Yeatman & Co.*